**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **AMBER MADSEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 2:22-cv-00854-AMM** |
| ) | |
| **R&L FOODS, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is before the court on a motion for summary judgment filed by the defendant, R&L Foods, LLC. Doc. 65. For the reasons explained below, the motion is **GRANTED**.

## I.    BACKGROUND

This case involves an employment dispute. These are the material facts construed in the light most favorable to *pro se* plaintiff Amber Madsen:

Ms. Madsen "began her employment with R&L . . . on May 8, 2017, as the only human resources employee." Doc. 67 ¶ 3; Doc. 70 ¶ 3. Her title was "director of human resources." Doc. 66-1 at 30. R&L had one office space in Winchester, Virginia and another in Birmingham, Alabama. *See* Doc. 67 ¶ 2; Doc. 70 ¶ 2. Ms. Madsen worked in the Birmingham office and reported to Rick Reynolds, CEO of R&L, who was based in Virginia. *See* Doc. 66-1 at 24, 29, 44, 46, 53.

Before her employment with R&L, Ms. Madsen was employed by Marriott's Timber Lodge – Marriott Vacation Club International from June 2006 to July 2009, where she took "professional courses" on human resources. *See* Doc. 68-4 at 117; Doc. 66-1 at 15. Ms. Madsen testified that she does not "have a degree in HR" and never "worked in an HR department" before her employment with R&L. Doc. 66-1 at 52–53.

Ms. Madsen's role at R&L was "to perform investigations [of] complaints by employees, customer[s,] . . . investigate EEOC charges filed[,] and respond to those." *Id*. at 31. She also "helped facilitate payroll." *Id*. Ms. Madsen did not "do operational work," was not "involved in . . . the design of the stores," did not conduct "any interviews for hiring at the stores," and did not "have any accounting functions" such as "mak[ing] operational budgets for the individual facilities or the company as a whole." *Id*. Her HR role did not generate revenue. *See* Doc. 67 ¶ 9; Doc. 70 ¶ 9.

Ms. Madsen's predecessor, Josh Reeves, left his employment in March 2016. *See* Doc. 66-1 at 32. Until Ms. Madsen was hired, about fourteen months later, there was no human resources professional at R&L. *See id*. at 33. During this time, "the district managers were dealing with customer complaints [and] employee complaints." *Id*.

2

Ms. Madsen's "starting pay in May of 2017" was $50,000, which was the same as her predecessor. *See id*. at 33–34. Ms. Madsen testified that she believed "there would be merit-based increases" but confirmed that "that was just [her] assumption." *Id*. at 53. She also received a car allowance of $500 per month, a work cell phone, insurance benefits, and a Christmas bonus. *See id*. at 33. During her employment, Ms. Madsen testified that she did not "receive any write-ups," was not disciplined, and "always performed [her] job satisfactor[ily]." *Id*. at 34.

Ms. Madsen testified that she experienced four sexually inappropriate encounters with Dave Westerfield, the Area Director of Operations for R&L in Alabama. *See id*. at 35–42. The first encounter was during her interview with R&L in 2017, where Ms. Madsen testified that Mr. Westerfield described an ongoing sexual harassment case by making hand gestures "mimicking sexual intercourse" and other sexual acts. *See id*. at 35–36. Ms. Madsen testified that Mr. Westerfield provided this information to prepare Ms. Madsen to participate in the investigation of that claim. *See id*. at 37.

Ms. Madsen also testified that Mr. Westerfield "was always showing YouTube videos in the office [with] inappropriate . . . [and] graphic content." *Id*. One of these videos depicted "little people . . . dressed in BDSM attire" engaging in

3

"humping and grinding." *Id*. She testified that no genitals were showing and "[t]here was no sexual penetration." *Id*. at 37–38. Ms. Madsen testified that Mr. Westerfield "thought [the video] was hilarious." *Id*. at 38. She testified that she saw it once, but heard it played multiple times in front of R&L's general manager and two of his underage guests. *See id*. This incident occurred around 2017 or 2018. *See id*.

Ms. Madsen testified that the third incident occurred after her "back surgery in May of 2017." *Id*. at 39. She testified that she "was on this pneumatic stool that kind of wobbles and . . . looks precarious." *Id*. She testified that Mr. Westerfield asked if she "order[ed] the proper attachments for it." *Id*. When Ms. Madsen asked what Mr. Westerfield meant, she testified that he "started Googling strap-on dildo[]s" and found it "hilarious." *Id*.

Ms. Madsen testified that the fourth and last incident occurred sometime before December 2019. *See id*. at 42–43. She walked out of the office "to get some fresh air" and saw Mr. Westerfield viewing "nude images" on his cell phone. *Id*. at 40. When confronted, Mr. Westerfield informed Ms. Madsen that what he was viewing was relevant to an ongoing EEOC investigation and that Ms. Madsen would "have to know these videos" because "it's evidence." *Id*. Ms. Madsen testified that Mr. Westerfield "proceed[ed] to show [her] multiple videos, multiple voice

messages, [and] multiple e-mails of very, very, very graphic material." *Id*. at 40–41. Later in her deposition, Ms. Madsen testified that she "got along with [Mr.] Westerfield." *Id*. at 71.

R&L provided a declaration, sworn under penalty of perjury, from Mr. Westerfield in which he stated that he "did not show Ms. Madsen any sexually inappropriate photos or videos outside the context of the pending EEOC Charge." Doc. 66-4 ¶ 4. He stated that he did not "make any sexually inappropriate comment directed to Ms. Madsen" and "[a]ny sex-based comment [he] made to Ms. Madsen related to the pending EEOC Charge and she needed the information as part of her job duties." *Id*. Mr. Westerfield also stated that when Ms. Madsen brought in a pneumatic stool, he was reminded of his motorcycle and "asked Ms. Madsen if she had the proper attachments like [he] had previously had on a motorcycle." *Id*. ¶ 5. He stated that by "proper attachments," he "was not referring to a sex toy" and "[a]t no time did [he] show Ms. Madsen an image of a sex toy in relation to her stool." *Id*. Mr. Westerfield stated that "[t]he only time [he had] shown Ms. Madsen a picture of a sex toy was after a restaurant manager reported to [him that] a sex toy was found in the restaurant and sent [him] a picture in the corresponding report." *Id*. He stated that he "sent the picture to Ms. Madsen for her to document and perform her job

duties associated with the restaurant manager's report." *Id*.

Ms. Madsen further testified about conflicts she had with co-workers from the Virginia office, particularly, Joy Gail, an Accounts Payable Manager, Kristi Green, an Accounts Payable Manager, Cathy Jewel, the District Manager, and Rick Lynch, the Chief Financial Officer. *See* Doc. 66-1 at 43–44, 49. She testified that Ms. Gail, Ms. Green, and Ms. Jewel had "Rick's ear" and "ruled the roost." *Id*. at 43.

Ms. Madsen testified that one example of conflict was when her initial paycheck did not include her car allowance. *See id*. at 44–45. Ms. Madsen testified that Ms. Gail, Ms. Green, and Mr. Lynch "were mad about it." *Id*. at 44. In another incident, Ms. Madsen testified her "paycheck had bounced." *Id*. Ms. Madsen emailed Ms. Green, Mr. Lynch, and Ms. Gail and copied Mr. Reynolds to follow up about the check. *See id*. at 45. She also testified that when she visited the Virginia office in April 2018, Ms. Gail, Ms. Green, and Mr. Lynch "berat[ed her] and belittl[ed her] telling [her that she] didn't know what was going on." *Id*. Ms. Madsen testified that Mr. Lynch later told her that she "had pissed everybody off because [she] copied Rick Re[y]nolds on an e-mail about [her] check being bounced." *Id*. at 47. Ms. Madsen further testified that during this Virginia visit, her hotel was paid for, but she was "berated" for having "overspent on [her] credit card." *Id*. at 48.

6

Ms. Madsen also testified that "Ms. Gail and Ms. Green were mad at [her] because they didn't get a car allowance" and because Ms. Madsen "stayed on them for requests." *Id*. at 49. She testified that Ms. Gail, Ms. Green, and Ms. Jewel "would not communicate" with her or timely "respond to business requests." *Id*. at 49–50. One example of this delay was when she requested information about a former employee's check. *See* Doc. 68-4 at 7. The former employee filed an EEOC claim, so Ms. Madsen was attempting to gather relevant details to "stay ahead of [the] issue." *See* Doc. 66-1 at 58; Doc. 68-4 at 7. Ms. Madsen sent three emails to Ms. Green regarding the check and testified that "[t]rying to get [the] check . . . took six weeks." Doc. 66-1 at 58; Doc. 68-4 at 7–8. Ms. Madsen believed that such behavior resulted from Ms. Gail, Ms. Green, and Ms. Jewel being upset with her because she "was a woman [placed] in the HR director position." Doc. 66-1 at 50. She testified that she was treated with "animosity" by these employees because she "wasn't a male," *id*. at 59, but did not testify that these co-workers expressed such sentiments to her or to other employees as far as she was aware, *id*. at 63. Ms. Madsen also testified that these employees "had a hard time being subordinate to another woman," but testified that they did not report to her. *Id*. at 59–60. Ms. Madsen further testified that she "think[s] Ms. Gail, Ms. Green, and Ms. Jewel [were] telling Mr.

Re[y]nolds to fire [her],” but did not testify that she knew this to be a fact. *See id*. at 58. She also testified that “the last time . . . Ms. Gail discriminated [against her] because of [her] sex” was “[w]hen she helped with the termination of [her]self and Phyllis.” *Id*. at 62. But she testified that she did not know “if [Ms. Gail] had any input about [the] termination” because Ms. Madsen “wasn’t a fly on the wall” and “wasn’t in that office.” *Id*. She also testified that she does not “know how much [Ms. Green] was involved in the termination.” *Id*. Later in her deposition, Ms. Madsen testified that Mr. Reynolds “made the decision for the layoff of [Ms. Madsen].” *Id*. at 74.

Ms. Madsen further testified that Mr. Westerfield told her on October 10, 2019, that “it would be different if [she] were a male,” and that Mr. Westerfield wanted to hire a woman “to pay them less.” *Id*. at 50, 52. She testified that she recorded this conversation as well as several other conversations with R&L employees. *See id*. at 8, 45, 46, 50, 57, 61, 75. She provided transcripts of these conversations, some of which were transcribed by hand and others which were transcribed by Otter, a transcribing software. *See id*. at 45, 47. Ms. Madsen testified that Otter is “not super reliable” and “[i]t doesn’t capture all the words[,]” so “[y]ou have to go back in and edit it.” *Id*. at 47.

8

Ms. Madsen also testified that Mr. Westerfield never told her that "Mr. Re[y]nolds made any derogatory comments about [her] being a woman or female" nor did Mr. Reynolds make any such comments to her directly. *Id*. at 53. Additionally, Ms. Madsen testified that Mr. Lynch never made "a comment to [her] about [her] gender." *Id*. at 54. She also testified that Mr. Westerfield never told her that Ms. Gail, Ms. Green, or Ms. Jewel "didn't like [her] because [she wasn't] male." *Id*. at 63.

In his declaration, Mr. Westerfield stated that Mr. Reynolds, Mr. Lynch, Ms. Gail, Ms. Green, and Ms. Jewel "never told [him] that [they] or anyone else would treat Ms. Madsen differently if she were a man." Doc. 66-4 ¶ 6. He stated that he has "no reason to believe anyone treated Ms. Madsen different[ly] because of her sex" and that "[a]ny work conflicts Ms. Madsen had with others was based on how she spoke and treated people, not her sex." *Id*. Mr. Westerfield also stated that he "never told Ms. Madsen that she was hired because the company wanted to pay a female less than a male." *Id*. ¶ 7.

Ms. Madsen further testified that Mr. Reynolds "was a screamer" and "was hot tempered." Doc. 66-1 at 53. She testified that "[h]e screamed at [her,]" "[h]e screamed at Dave Westerfield all the time[,]" and she assumes that "he scream[ed]

at Ms. Gail." *Id*. at 54. Ms. Madsen also testified that Mr. Reynolds would not communicate "because [her] e-mails were too long." *Id*. at 55. She testified that "[a]nything more than 18 words [and] he deleted it automatically." *Id*. She testified that he also did not respond to her shorter emails. *See id*. at 55–56. Ms. Madsen provided copies of emails that she sent to Mr. Reynolds for which she did not receive a response. *See* Doc. 68-4 at 8. Ms. Madsen also testified that when the pandemic hit, Mr. Reynolds did not communicate with her regarding how to handle COVID-19 protocols. Doc. 66-1 at 56; Doc. 68-1 at 97.

Ms. Madsen testified that she believed Mr. Westerfield wanted her fired, but also testified that Mr. Westerfield stated to her that he did not want her fired in an October 2019 call. *See* Doc. 66-1 at 57. She also believed that Mr. Reynolds wanted her fired around the same time "because there had been some complaints filed." *Id*. She testified that she didn't "think he liked [her meddling] in investigations which was [her] job as investigating grievances." *Id*. at 58. She testified that she believed "Mr. Re[y]nolds liked Ms. Gail, Ms. Green, and Ms. Jewel more" than her and that they were "telling Mr. Re[y]nolds to fire [her]." *Id*.

Ms. Madsen testified about a meeting she had with Mr. Reynolds in December 2019 in which she "told him about all the barriers [she was] up against and the

animosity and hostile work environment." *Id*. at 57–58. She testified that Mr. Reynolds told her to come to him if such work problems repeated and that he would take care of it. *See id*. Ms. Madsen testified that additionally, in February 2020, she emailed Mr. Reynolds about ongoing communication delays she experienced with Ms. Jewel. *Id*. at 58–59. In this email, she stated,

> I'm at a loss here, when we spoke in December I shared some of my thoughts regarding the barriers I've experienced within the system of communication, you told me that if I found myself in the same position again to forward it to you, so after 4 attempts myself, I did just that, my initial request was 10 days ago and still no one has communicated the status with me, and I simply can't understand why?

Doc. 68-4 at 8. She testified to expressing her communication issues with Ms. Gail, Ms. Green, and Ms. Jewel to Mr. Reynolds. *See* Doc. 66-1 at 59. Ms. Madsen testified that Mr. Reynolds did not respond. *See id*. Despite the December 2019 meeting and subsequent emails, she testified to being "at a loss" because of Mr. Reynolds's continued lapses in communication. *Id*.

Ms. Madsen testified that she did not open an investigation against Ms. Gail, Ms. Green, and Ms. Jewel in response to the alleged discrimination she experienced even though it was her "job to open up investigations when [she had] reports of discrimination." *Id*. at 61. She testified that she did not "tell Rick Re[y]nolds at any

11

time that [Ms. Gail, Ms. Green, or Ms. Jewel were] discriminating against [her] because [she was] a female." *Id*. When pressed on the issue, Ms. Madsen testified that she "wasn't allowed to email him" and that her conversations with Mr. Reynolds "went through [Mr. Westerfield]." *Id*. at 62. But she testified earlier in her deposition that Mr. Reynolds told her during their December 2019 meeting to come to him with work issues and that he would take care of it and testified that she never told Mr. Westerfield that Ms. Gail, Ms. Green, and Ms. Jewel discriminated against her for being a female. *See id*. at 59, 62.

R&L provided a declaration, sworn under penalty of perjury, from Mr. Reynolds in which he stated that he "never received a complaint or concern from Ms. Madsen of sex-based or disability-based discrimination or sexual harassment, or anything like that." Doc. 66-3 ¶ 7. He stated that "Ms. Madsen never made a report to [him] of alleged sexual harassment relating to Dave Westerfield, or any other employee" and he "was not told about any allegation that Mr. Westerfield made sexually inappropriate comments to Ms. Madsen or showed inappropriate videos or photos to Ms. Madsen." *Id*. He further stated that "Ms. Madsen did not relate any of her workplace concerns to her sex, any alleged disability, or sexual harassment during the December 2019 meeting, in the February 2020 email, or at any other time

for that matter." *Id*. ¶ 8.

Ms. Madsen also testified about conflicts regarding her work cell phone. *See* Doc. 66-1 at 68–69. She testified that it "was dying" in December 2019 and she asked Mr. Westerfield, Mr. Lynch, and Mr. Reynolds that it be replaced, but that "[n]othing" was done until February or March of 2020. *Id*. at 69. She testified that as soon as other employees had cell phone issues, "they got an upgrade." *Id*. at 70. Ms. Madsen testified that the delays she experienced were in "[r]etaliation" to "all [her] complaints" and her "rehashing" of "work gripes." *Id*. at 71. Ms. Madsen testified that sometime in March 2020, approximately three months after Ms. Madsen first raised concerns regarding her phone quality, Mr. Lynch approved her request and told her to contact Sprint for further details. *See id*. at 69–70. In his declaration, Mr. Reynolds stated that "R&L Foods' practice was to recycle work phones from former employees" and "[t]o the best of [his] knowledge, [Ms.] Madsen received the next available phone . . . in accordance with the established work practice." Doc. 66-3 ¶ 6.

Ms. Madsen additionally testified about ankylosing spondylitis (AS), an illness that she was diagnosed with in 2004. *See* Doc. 66-1 at 25, 64–65. She testified that through the years she experienced this illness, she "was still able to perform"

and "manage [her] health without it getting in the way of [her] performance." *Id*. at 64. She testified that Mr. Westerfield knew about her diagnosis "[e]arly on." *Id*.

Ms. Madsen testified that at the start of the pandemic, on March 12, 2020, she "packed up [her] stuff . . . and worked from home" because of the uptick in COVID-19 cases. *Id*. at 63. On March 13, 2020, she testified that she "spoke to Mr. Westerfield about working from home." *Id*. Ms. Madsen testified that the only reason she needed to work from home was because she was "on biological Enbrel," but did not testify that she told this fact to Mr. Westerfield. *See id*. at 64. In her evidentiary submissions, Ms. Madsen provided a statement from her doctor that Enbrel "increases the risk of serious infections." Doc. 68-1 at 83. Ms. Madsen testified that she had a follow up conversation with Mr. Westerfield on March 16, 2020, where she stated that she "had a doctor note that was mandating that [she] work from home for ADA reasonable accommodation due to [her] compromised immune system." Doc. 66-1 at 64. Ms. Madsen testified that Mr. Westerfield "didn't really say much," but told her that it was not necessary to send in her doctor's note. *Id*. She testified that she was "allowed" to work from home, was not "disciplined for working from home," and performed her job "[v]ery successfully" from home." *Id*.

Ms. Madsen testified that on March 16, 2020, Phyllis Jones, who was Ms.

14

Madsen's co-worker and mother, was explaining Ms. Madsen's condition to R&L employees during a staff meeting. *See id*. at 24, 64–65. Some reference was made that Ms. Madsen has an "autoimmune" condition. *Id*. at 65. During this meeting, for which Ms. Madsen was not present, Ms. Madsen was told by another co-worker that Mr. Westerfield remarked, "oh Amber must have AIDS" in a "joking" manner. *Id*. Ms. Madsen testified that she does not "know if he ever made another comment like that." *Id*. She testified that she did not "report that comment to anybody." *Id*. She testified that she did not recall ever speaking to "Mr. Re[y]nolds about ankylosing spondylitis" or about working from home. *Id*. at 65–66. She testified that she believes Mr. Westerfield may have conveyed information about her illness to Mr. Reynolds. *Id*. at 65. When asked if she actually knows this to be true, Ms. Madsen testified that she only knows that Mr. Westerfield spoke to Mr. Reynolds about her request to work from home and "something to [the] notion" of "getting [her] doctor approval." *Id*. Ms. Madsen also testified that she corresponded with attorneys at Burr Forman, R&L's legal counsel, with questions about navigating COVID-19 when having an illness, but did not provide testimony or further evidence to confirm that the attorneys conveyed the contents of those communications to Mr. Reynolds. *See id*. at 66, Doc. 68-4 at 140.

15

In his declaration, Mr. Westerfield stated that in March 2020, "Ms. Madsen said something along the lines of 'I have an autoimmune disease.'" Doc. 66-4 ¶ 8. He stated that "[a]s a serious question, [he] responded, 'like AIDS.'" *Id*. He stated that he "did not make any further comment about Ms. Madsen's autoimmune disease" and "did not tell Rick Reynolds that Ms. Madsen had told [him] she has an autoimmune disease, that she had a medical condition or that she needed to work from home due to a medical condition." *Id*. Mr. Westerfield further stated that he "did not consider Ms. Madsen to have a disability, but, even if she was disabled, [he] would not have treated her worse and would have worked with her on any work modifications she needed." *Id*. He stated that "[t]he only request made by Ms. Madsen was to work from home which [he] permitted." *Id*.

Ms. Madsen testified about her separation with R&L, which occurred over a call with Mr. Westerfield on May 22, 2020. *See* Doc. 66-1 at 73. She testified that Mr. Westerfield informed her that R&L was firing her because her "position was redundant" and for "cost cutting." *Id*. at 74. She also testified that Ms. Jones was fired, and the Birmingham office was eventually closed. *See id*. at 73–74. She testified that Mr. Reynolds "made the decision for the layoff of [her] and Ms. Jones in the reduction of force" and "to close the Birmingham office." *Id*. at 74.

Ms. Madsen testified that Mr. Reynolds sent an email in March 2020 that R&L's "financial house was in stable order." *Id*. But she agreed that "[t]he company was losing money and . . . cutting costs" because of the "Covid crisis and uncertainty at the time." *Id*. at 75. She also agreed that "business owners can cut costs" and that "one way to cut costs is to close an office." *Id*. at 76. She further testified that when she was fired, "there was a global pandemic, a fiscal meltdown, unprecedented unemployment, and historically some of the most unprecedented times." *Id*. at 74 (cleaned up). She also testified that "[n]obody" "took over the HR functions after [her] separation." *Id*. at 75. Ms. Madsen was offered a severance in her separation agreement, which extended her health benefits for a period of time. *See id*. at 77; Doc. 66-3 ¶ 15; *see id*. at 42. Ms. Madsen declined to accept the severance. Doc. 66-3 ¶ 15; Doc. 70 ¶ 21.

In his declaration, Mr. Reynolds stated that "the COVID-19 pandemic quickly caused unprecedented uncertainty and financial difficulties for R&L" and he "was forced to make several difficult decisions on behalf of the company." Doc. 66-3 at ¶ 9. He stated that net earnings in March 2019 were $384,788.40 as opposed to "only $75,495.37" in March 2020. *Id*. ¶ 10. He stated that in April 2020, "the company had only made net earnings equivalent to 17.4% of its 2019 net earnings year-over-

17

year." *Id*. "Because of the company's dire financial circumstances and the continued uncertainty associated with the COVID-19 pandemic, [he] made the decision to cut costs, including closing the Birmingham Office and eliminating the positions held by Ms. Madsen and Ms. Jones." *Id*. ¶ 11. Mr. Reynolds stated that unlike the district managers and area directors of operations, "Ms. Madsen's and Ms. Jones' positions were not necessary for store operations or revenue generation." *Id*. He stated that he "was the sole decisionmaker in relation to the decisions to eliminate Ms. Madsen's position" and he "did not consult [or] rely on the opinions of Mr. Westerfield, Mr. Lynch, Ms. Gail, Ms. Green, or Ms. Jewel in making the decision to eliminate Ms. Madsen's position." *Id*. ¶ 12. Mr. Reynolds stated that "[a]t the time [he] made the decision to eliminate Ms. Madsen's position and at the time the decision was communicated to Ms. Madsen, [he] was unaware Ms. Madsen had ankylosing spondylitis, any autoimmune deficiency, or any other alleged disability." *Id*. ¶ 13. He stated that neither Ms. Madsen, Mr. Westerfield, attorneys at Burr Forman, nor "any other person . . . told [him] that Ms. Madsen suffered from ankylosing spondylitis, any autoimmune deficiency, or any other alleged disability before the discharge decision." *Id*. Mr. Reynolds stated that the decision to fire Ms. Madsen occurred before Ms. Madsen contacted attorneys at Burr Forman regarding

navigating COVID-19 while having an illness. *See id.*

In July 2020, after her separation from R&L, Ms. Madsen engaged attorney Cynthia Wilkinson to represent her in filing a charge of discrimination with the EEOC. Doc. 66-1 at 16–17; *see* Doc. 68-1 at 126–162. On November 18, 2020, the charge of discrimination was filed, in which Ms. Madsen alleged that she had "been retaliated against and discriminated against, harassed, subjected to a hostile work environment, and terminated because of [her] gender . . . in violation of Title VII of the Civil Rights Act of 1964, and the Equal Pay Act of 1963." Doc. 68-4 at 5; *see* Doc. 66-1 at 16. She further alleged that she was "harassed, treated differently, denied a reasonable accommodation, perceived and/or regarded as disabled, retaliated against, and terminated in violation of the ADA." Doc. 68-4 at 5.

In her communications with Ms. Wilkinson's office, Ms. Madsen used "email.ambermadsen@gmail.com" as her email address. *See* Doc. 68-1 at 126–162. On April 5, 2022, Ms. Wilkinson sent an email to "ambermadsen@gmail.com," stating that the EEOC "has been unable to find any violations" and "is going to close their investigation and will issue a Dismiss and Notice of Rights at some point once it has been submitted for issuance." Doc. 68-2 at 19. She also stated that "once your Dismissal and Notice of Rights is issued you will only have ninety (90) days to file

any lawsuit." *Id*. Finally, Ms. Wilkinson stated, "I am unable to represent you further and file a lawsuit on your behalf" and "I will not take any further action on your case." *Id*.

The EEOC issued the Notice of Right to Sue letter ("RTS letter") on April 7, 2022, which was emailed to Ms. Wilkinson. *See* Doc. 66-2 at 85, 91. On the same day, the EEOC investigator handling the case emailed Ms. Wilkinson that his "supervisor has authorized [him] to send [Ms. Wilkinson] the [RTS] letter." *Id*. at 88. Ms. Wilkinson acknowledged this email. *See id*. Ms. Wilkinson sent a follow up email to "ambermadsen@gmail.com" on April 11, 2022, attaching a copy of the RTS letter, reiterating that she "will not be able to represent [Ms. Madsen] further regarding [her] potential claims against R&L Foods, LLC," that Ms. Madsen has "only . . . 90 days to file a lawsuit regarding [her] potential claims against R&L Foods and any lawsuit would have to be filed by July 6, 2022," and that the "deadline will not be extended." Doc. 68-2 at 17 (cleaned up).

Ms. Madsen testified that because these emails were sent to the incorrect email address, she did not receive them. *See* Doc. 66-1 at 18–19. She testified that when she "hadn't heard from [Ms. Wilkinson] in months . . . [she] called her and left a message asking what the status was." *Id*. at 18. Then, on June 28, 2022, Ms.

Wilkinson forwarded to Ms. Madsen the emails that were previously sent to the incorrect email address. *See id*. at 18–19; Doc. 68-2 at 17–18. On July 8, 2022, ninety-two days after the RTS letter was issued, Ms. Madsen filed this lawsuit. *See* Doc. 1; Doc. 66-1 at 19.

## II.    PROCEDURAL HISTORY

After Ms. Madsen commenced this lawsuit, she filed an amended complaint, Doc. 26, which R&L moved to dismiss, Doc. 27. The court denied R&L's motion as to four claims: (1) gender discrimination/hostile work environment in violation of Title VII; (2) employment retaliation in violation of Title VII; (3) employment discrimination in violation of the ADA; and (4) employment retaliation in violation of the ADA. *See* Doc. 37 at 8. Additionally, the court clarified that Ms. Madsen "may seek relief only for [these] four claims" and "only for events that occurred on May 22, 2020," but "[e]vidence of conduct occurring before May 22, 2020, may be relevant to support these claims." Doc. 42 at 4–5. On February 24, 2025, R&L filed a motion for summary judgment as to all claims. *See* Doc. 65. The motion is fully briefed. *See* Doc. 69; Doc. 74.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## IV.    ANALYSIS

The court has construed Ms. Madsen's pleadings liberally and has drawn all

reasonable inferences in her favor. *See United States v. Ogiekpolor*, 122 F.4th 1296, 1304 (11th Cir. 2024); *Gomez-Diaz v. United States*, 433 F.3d 788, 791 (11th Cir. 2005).

Before filing an action under Title VII of the Civil Rights Act and Title I of the Americans with Disabilities Act, a plaintiff must exhaust administrative remedies by filing a timely charge of discrimination with the EEOC. *See Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004); *Batson v. Salvation Army*, 897 F.3d 1320, 1327–28 (11th Cir. 2018); *Stamper v. Duval Cnty. Sch. Bd.*, 863 F.3d 1336, 1339–40 (11th Cir. 2017). "If the [EEOC] determines after an investigation 'that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify' the [plaintiff]." *Stamper*, 863 F.3d at 1340 (quoting 42 U.S.C. § 2000e-5(b)). "When the [plaintiff] receives a notice of dismissal from the [EEOC], she has [ninety] days to file a civil action against the employer." *Id*. Ordinarily, the receipt date is established by the plaintiff's, plaintiff's counsel's, or counsel's law office's actual receipt of the notice letter from the EEOC, sometimes called a "right-to-sue" letter or "RTS letter." *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 92–93 (1990).

The Eleventh Circuit has explained that it does not employ a rigid, universal

rule to determine when a complainant has received the RTS letter, because complainants are responsible for an "orderly and expeditious resolution" of their claims. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 952 (11th Cir. 2005) (cleaned up) (quoting *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1340 (11th Cir. 1999)). The Eleventh Circuit has expressed concern about providing complainants a "manipulable open-ended time extension which could render the statutory minimum meaningless." *Id.* (cleaned up) (quoting *Zillyette*, 179 F.3d at 1340). As such, courts must analyze the ninety-day limitations period "on a case-by-case basis to fashion a fair and reasonable rule for the circumstances of each case, one that would require plaintiffs to assume some minimum responsibility without conditioning a claimant's right to sue on fortuitous circumstances or events beyond [their] control." *Id.* (cleaned up) (quoting *Zillyette*, 179 F.3d at 1340).

R&L argues that Ms. Madsen's lawsuit is untimely because it was filed ninety-two days after the EEOC issued the RTS letter and emailed it to Ms. Wilkinson. *See* Doc. 67 at 21–22. Ms. Madsen argues that Ms. Wilkinson no longer represented her as of April 7, 2022, so the ninety-day period should begin from the date "the []RTS Letter was perceived to have been delivered to Plaintiff." *See* Doc. 70 ¶¶ 41–43.

Ms. Madsen testified that she did not receive the RTS letter until Ms. Wilkinson forwarded it to her on June 28, 2022. *See* Doc. 66-1 at 18–19; Doc. 68-2 at 17; Doc. 70 ¶ 40. Undisputed evidence establishes that Ms. Madsen used "email.ambermadsen@gmail.com" and a "tahoemadsen" account when communicating with Ms. Wilkinson's office, but never used ambermadsen@gmail.com. *See* Doc. 68-1 at 126–162. Undisputed evidence also establishes that Ms. Wilkinson's communications to Ms. Madsen on April 5th and April 11th, notifying her that a RTS letter was forthcoming, and that Ms. Madsen would have only ninety-days to file a lawsuit, were sent to "ambermadsen@gmail.com," an account that is not associated with Ms. Madsen in the record. *See* Doc. 68-2 at 16–17, 19. Ms. Madsen also testified that "ambermadsen@gmail.com" was an incorrect email address. Doc. 66-1 at 18.

The dispositive issue is whether Ms. Wilkinson's receipt of the RTS on April 7, 2022, started the ninety-day clock. Such would be the case only if Ms. Wilkinson represented Ms. Madsen at that time. *See Irwin*, 498 U.S. at 92–93. R&L argues that "the record indicates [Ms.] Wilkinson represented Plaintiff for purposes of receiving the EEOC's closure notice." Doc. 67 at 21. R&L supports this argument with an excerpt from Ms. Madsen's deposition in which she agreed that Ms. Wilkinson was

her attorney "at the time" the RTS letter was issued:

> Q. [The RTS letter] has on the top it was issued on
> April 7, 2022?
> A. That's what it says.
> Q. Can you look at the second page there? Do you
> see who the notice of right to sue letter was sent to?
> A. To everybody but me.
> Q. Is the third person there Ms. Wilkinson?
> A. Yes.
> Q. Who was your attorney at the time?
> A. That's correct.

Doc. 66-1 at 17; *see also* Doc. 67 at 21 n.3.

Ms. Madsen now asserts that Ms. Wilkinson was not her attorney when the

RTS was issued. Doc. 70 ¶¶ 39–43. Ms. Madsen points to Ms. Wilkinson's April 5,

2022, email, in which Ms. Wilkinson states that she is unable to represent Ms.

Madsen further regarding her potential claims against R&L. *Id*. ¶ 39; Doc. 68-2 at

19. Ms. Madsen also disputes in her brief that she "expressly acknowledge[d] that

Wilkinson was her attorney on April 7, 2022" during her deposition. Doc. 70 ¶ 42.

But under controlling precedent, the existence of an attorney-client

relationship is based on the client's subjective belief. *See Miss. Valley Title Ins. Co.*

*v. Thompson*, 802 F.3d 1248, 1253–54 (11th Cir. 2015). Ms. Madsen testified that

sometime after June 8th, she "called [Ms. Wilkinson] and left a message asking what

the status [of her case] was." *See* Doc. 66-1 at 18. Following this communication,

Ms. Wilkinson forwarded to Ms. Madsen's correct email address "all the e-mails that she had [previously] sent" to the incorrect email address. *Id*. at 18–19; Doc. 68-2 at 17–21. Ms. Madsen would not have followed up with Ms. Wilkinson regarding the status of her case if she did not believe at the time that Ms. Wilkinson was her attorney. And, in any event, Ms. Madsen did not know of Ms. Wilkinson's intent to terminate the representation until June 28, 2022. *See* Doc. 66-1 at 18–19; Doc. 68-2 at 17–21. Ms. Madsen's testimony during her deposition is consistent with her course of conduct. *See* Doc. 66-1 at 17. Accordingly, undisputed evidence establishes that as of April 7, 2022, Ms. Madsen subjectively believed that Ms. Wilkinson represented her. As such, Ms. Wilkinson's receipt of the RTS letter on that date started the ninety-day clock.

In any event, Ms. Madsen's time to sue did not expire during the ensuing communication gaps with Ms. Wilkinson. As of June 28, 2022, Ms. Madsen still had eight days to file a timely lawsuit. The emails forwarded by Ms. Wilkinson on June 28, 2022, cautioned Ms. Madsen that once the RTS was issued, only ninety days remained to file a timely lawsuit. *See* Doc. 68-2 at 17 ("[y]ou only have 90 days to file a lawsuit regarding your potential claims against R&L Foods and any lawsuit would have to be filed by July 6, 2022" and "[t]his deadline will not be extended")

(cleaned up); *id.* at 19 ("once your Dismissal and Notice of Rights is issued you will only have ninety (90) days to file any lawsuit" which "includes weekends"). Having received this information on the eighty-second day, the onus was on Ms. Madsen to file a timely complaint. But Ms. Madsen missed the deadline by two days, making her complaint untimely.

## V.    CONCLUSION

For the foregoing reasons, R&L's motion for summary judgment is **GRANTED** and the Clerk of the Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 25th day of September, 2025.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE